Sidney Alexander v. Commissioner.
Alexander v. Commissioner
Docket No. 81438.
United States Tax Court
T.C. Memo 1967-6; 1967 Tax Ct. Memo LEXIS 257; 26 T.C.M. (CCH) 38; T.C.M. (RIA) 67006; January 11, 1967
*257 Held, that petitioner has failed to establish error in the Commissioner's determination that he had unreported income for each of the 3 taxable years involved. Held, that the Commissioner has failed to establish that any part of any deficiency for any of the taxable years involved, is due to fraud within the meaning of the applicable statutes. Held, that assessment and collection of any deficiency or addition to tax for the yeas 1953 are barred by the statute of limitations. Held, that an addition to tax for substantial underestimate of estimated tax should be imposed for the year 1954, under section 294(d)(2) of the 1939 Code; but that imposition of such an addition to tax for the year 1953 is barred by limitation. Bruce I. Hochman and Justin L. Goldner, for the petitioner. Thomas J. Sullivan, for the respondent. PIERCE *258 Memorandum Findings of Fact and Opinion PIERCE, Judge: The Commissioner determined deficiencies in income tax and additions to tax against the above-named petitioner as follows: Additions to tax
Calendar
Sec. 293(b)
Sec. 6653(b)
Sec. 294(d)(2)
year
Deficiency
1939 Code
1954 Code
1939 Code
1953
$ 71,653.41
$36,310.47
$4,410.45
1954
109,807.00
$54,903.50
6,388.20
1955
45,358.15
22,679.08
The issues for decision are: (1) Whether the petitioner is chargeable with unreported taxable income for each of the years involved - consisting of cash aggregating more than one-quarter million dollars, never reported by him for income tax purposes, which he used during said years in purchasing numerous bank checks and Government bearer securities under names and addresses other than his own, purportedly as repeated accommodations to a stranger who cannot be located and whose address, business, and other means of identification were at all times unknown. (2) Whether any part of any deficiency or underpayment in income tax for any of the years involved, is due to fraud within the meaning of section 293(b) of the 1939 Code and *259 section 6653(b) of the 1954 Code. (3) Whether for the year 1953, assessment and collection of any deficiency in income tax or addition to the tax is barred by the statute of limitations. (4) Whether for each of the years 1953 and 1954, an addition to tax should be imposed under section 294(d)(2) of the 1939 Code, for substantial underestimate of estimated income tax. All other issues raised by the pleadings have either been settled by the parties or been abandoned by the petitioner. All settlements will be given effect in the computation of tax to be made herein under Rule 50. Findings of Fact Some of the facts have been stipulated. The stipulations of fact and all exhibits identified therein are incorporated herein by reference. Re General Facts The petitioner, Sidney A. Alexander, is a resident of Los Angeles, California. He filed a timely individual Federal income tax return for each of the years involved, with the district director of internal revenue at Los Angeles. Petitioner was born in Philadelphia, Pennsylvania, in about 1917; and during the taxable years involved, he was about 36 to 38 years of age. In the 1930's and early 1940's he lived with his parents *260 in Allentown, Pennsylvania; and he was there employed as a clerk in a small store operated by his father. During part of World War II he served in the United States Army. In or about the year 1946 petitioner became a resident of Los Angeles, California; and at that time he organized a shirt manufacturing business in said city with his two brothers, Albert and Jerome Alexander. This family business organization consisted initially of a partnership of petitioner and his brothers, known as The Alexander Shirt Company, together with a related corporation known as Angeles Apparel Company. In 1949 the partnership was expanded to include petitioner's father, Ben Alexander. And by the early part of 1953, the family business had been further expanded by the creation of at least two additional corporations, known as Alexander Manufacturing Corporation and Alexander Shirt Company. All units of said family organization operated from a common business address. Petitioner was the oldest of the three Alexander brothers. He was unmarried at all times here material. And at least until 1950, he lived with his brothers, his sister and his father, in the same household. Petitioner had general charge *261 of administering the family enterprise. He executed most of the partnership returns of income, and also most of the income tax returns for the several corporations. Also, he personally handled the finances for the business; and from 1948 through 1955 he negotiated numerous loans on behalf of the business with the Textile Branch of the Bank of America, in Los Angeles. In 1955, such loans represented a liability to that bank of at least $80,000. The amount of the sales which the family partnership reported for its fiscal years 1953 through 1956 (exclusive of the sales of the related family corporations), were as follows: Fiscal Year Ended June 30
Gross Sales
1953
$1,864,745.14
1954
1,804,209.56
1955
1,712,646.94
1956
1,608,408.22
Re Purchases of Government Securities During the early part of 1955, the Internal Revenue Service obtained information that a considerable number of United States Government securities of substantial value, which were all payable to bearer, were being purchased from various Los Angeles banks under the names of "Louis Gross," "Lou Gross" and "L. Gross". The Service thereupon endeavored to identify and locate the individual who *262 had been purchasing these securities, in order to ascertain whether there may have been any violation of the Internal Revenue laws. The written applications for purchase of said securities were all filed with the seller banks under one or another of the abovementioned designations for "Gross." In most instances, the address of the purchaser as represented in the application, was either "General Delivery, Main Post Office, Los Angeles, California," or simply "General Delivery, Los Angeles, California." In three instances, however, the address was represented to be some specific number and street in Los Angeles; but upon investigation by the Internal Revenue Service, such specific address was found to be nonexistent. The records of the seller banks indicated that the purchase price for the securities was always paid either: By cash; or by cashier's check issued from another bank; or by credit for redemption of other similar securities which had previously been purchased by the same person; or by some combination of the above methods. In those instances where cashier's checks from other banks were used to pay for the securities, the records of those other banks revealed that said *263 cashier's checks were in all instances obtained either in the name "Lou Gross," "L. Gross," or "H. Miller;" and that where the name "H. Miller" was employed, the cashier's check was thereafter endorsed with both the names "H. Miller" and "L. Gross" before it was used at the other bank for the purchase of Government securities. Here again, the address given by the purchaser of each cashier's check, was either "General Delivery, Los Angeles," or some specific number and street that did not exist. Payment for all cashier's checks purchased was made in cash. Usually two cashier's checks of different amounts were purchased from the same bank at the same time; and then, either on the same day or a short time later, these cashier's checks were used in purchasing Government securities from a different bank. In each instance, the bank selected to issue the cashier's checks and also the bank selected to sell the Government securities was one where the purchaser was not known except by the name "H. Miller" or "Lou Gross," under which he dealt. The following is a summary of the United States securities, in bearer form, which were purchased, redeemed or exchanged under the name of "Gross," during *264 the years 1951 through 1955: Date
Securities at
Name and
Date
Address Used
Purchased
Cost
Face Value
by Purchaser
Purchased
Redeemed
From
8/2/51
$ 1,002.81
$ 1,000.00
Louis Gross,
Bank of Am.,
1/15/53
General
Branch
Delivery,
Los Angeles
1/13/53
25,201.10
5,000.00
Louis Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Louis Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Louis Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Louis Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Louis Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
1/15/53
15,124.16
5,000.00
Lou Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Lou Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Lou Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
1/23/53
25,226.42
5,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
5,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
5,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
5,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
5,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
4/18/53
15,185.10
5,000.00
Lou Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Lou Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
5,000.00
Lou Gross,
Bank of Am.,
2/15/55
General
Main
Delivery,
Los Angeles
6/19/53
10,022.95
10,000.00
Lou Gross,
Security
2/15/55
5407
First Nat.
Marshall
Drive, L.A.
5/12/54
35,947.63
10,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
5,000.00
Lou Gross,
Security
Outstanding
General
First Nat.
Delivery,
Los Angeles
1,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
6/18/54
19,980.80
10,000.00
L. Gross,
Security
2/14/55
General
First Nat.
Delivery,
Los Angeles
10,000.00
L. Gross,
Security
2/14/55
General
First Nat.
Delivery,
Los Angeles
6/25/54
29,972.10
10,000.00
Lou Gross,
Security
2/14/55
(No Address)
First Nat.
10,000.00
Lou Gross,
Security
2/14/55
(No Address)
First Nat.
10,000.00
Lou Gross,
Security
2/14/55
(No Address)
First Nat.
8/12/54
9,982.00
10,000.00
Lou Gross,
Security
2/14/55
General
First Nat.
Delivery,
Los Angeles
9/29/54
19,979.02
10,000.00
Lou Gross,
Security
2/14/55
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
2/14/55
General
First Nat.
Delivery,
Los Angeles
11/24/54
19,979.16
10,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
2/15/55
General
First Nat.
Delivery,
Los Angeles
2/14/55 *
100,791.61
100,000.00
Lou Gross,
Security
11/10/55
General
First Nat.
Delivery,
Los Angeles
2/15/55 **
151,150.90
100,000.00
Lou Gross,
Security
11/11/55
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
Outstanding
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
Outstanding
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
Outstanding
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
Outstanding
General
First Nat.
Delivery,
Los Angeles
10,000.00
Lou Gross,
Security
Outstanding
General
First Nat.
Delivery,
Los Angeles
11/10/55 ***
100,000.00
Ten @ 10,000.00
Lou Gross,
Fed. Reserve
Outstanding
6017
Bank
Melrose, Los
Angeles
11/11/55 ***
100,000.00
Ten @ 10,000.00
Lou Gross,
Fed. Reserve
Outstanding
6017
Bank
Melrose, Los
Angeles
*265 As regards the Government securities purchased during the taxable years 1953 through 1955 here involved, the portion of the total purchase price per year which was paid with cash or cashier's checks (as distinguished from credits for redemption or exchange of securities previously acquired), was as follows: 1953
1954
1955
Total purchase price per year of
$90,759.73
$135,840.71
$451,942.51
securities acquired
Part paid by credit for redemption or
exchange of
securities previously acquired
1,017.16
(none)
423,089.61
Part paid with cash or cashier's checks
89,742.57
135,840.71
28,852.90
Total cash and cashier's checks (purchased with cash) used in acquiring
Government securities
during all three taxable years involved = $254,436.18.
*266 The following is a summary of the cashier's checks (all purchased with cash) which were used during the years 1953 and 1954 in connection with the acquisition of the above-mentioned Government securities: Date
Face
Purchased in
Address Used
Purchased
Date of
Purchased
Amount
Name of
by Purchaser
From
Disposition
6/19/53
$10,000
Lou Gross
5207 Marshall
Bank of Am.
6/19//53
Dr.
Los Angeles
Main Office,
Los Angeles
1/25/54
15,000
H. Miller
General
Bank of Am.
5/12/54
Delivery
Los Angeles
Main Office,
Los Angeles
7,000
H. Miller
General
Bank of Am.
5/12/54
Delivery
Los Angeles
Main Office,
Los Angeles
5/ 5/54
5,800
L. Gross
General
Bank of Am.
5/12/54
Delivery
Los Angeles
Main Office,
Los Angeles
6,800
L. Gross
General
Bank of Am.
5/12/54
Delivery
Los Angeles
Main Office
Los Angeles
6/18/54
20,000
L. Gross
6080 Oxford
Bank of Am.
6/18/54
St.
Los Angeles
Main Office
Los Angeles,
7,000
L. Gross
6080 Oxford
Bank of Am.
6/25/54
St.
Los Angeles
Main Office
Los Angeles
6/25/54
20,000
L. Gross
(none)
California
6/25/54
Bank,
Main Office,
Los Angeles
2,950
L. Gross
(none)
California
6/25/54
Bank,
Main Office,
Los Angeles
*267 The efforts made by the Internal Revenue Service to identify and locate some individual employing the name "Louis Gross" or some variation thereof, who might have been the purchaser of the Government securities and cashier's checks above mentioned, included the following: A checking of the records of the Los Angeles Police Department; a checking of the Internal Revenue records located in Government offices at San Francisco, Sacramento, San Diego, Reno and Philadelphia; and the running-down of all rumors and leads that were developed. Such efforts failed to reveal that any such "Louis Gross" existed. Re Identification of Petitioner as the Purchaser of the Government Securities and Cashier's Checks Involved On November 11, 1955, a Special Agent of the Internal Revenue Service, accompanied by two Los Angeles policemen, intercepted a man in front of the Federal Reserve Bank in Los Angeles who had just obtained certain Government securities from that bank while acting under the name of "Lou Gross." The securities so obtained and then in his possession consisted of 10 United States Treasury bearer coupon bonds of the face value of $10,000 each. On the prior day of November 10, this *268 same man had left with the bank a Government bond of the face amount of $100,000, together with a written request for a denominational exchange thereof into the 10 smaller bonds above mentioned. The $100,000 bond so left for exchange was the Government security of that face value (listed in the foregoing summary of security purchases) which had been purchased by the same man on February 14, 1955, under the name of "Lou Gross, General Delivery, Los Angeles." The application for denominational exchange likewise had been submitted under the name of "Lou Gross;" but the address employed thereon, which was 6017 Melrose, was nonexistent. At the same time that the man in question had picked up the 10 smaller bonds referred to above, he had delivered to said Federal Reserve bank a second $100,000 face-value Government bearer bond (previously purchased by him in the same year), together with a written request (executed in the name of "Lou Gross") that this bond likewise be exchanged for 10 smaller bonds of the face value of $10,000 each. Arrangements were thereupon made for him to pick up these additional smaller bonds a few days later, on November 14, 1955 - which actually was done. *269 The Special Agent of the Internal Revenue Service and the two Los Angeles policemen, upon intercepting as aforesaid this man who was using the name of "Lou Gross," demanded that he establish his identity. The man thereupon stated that his true name was Sidney A. Alexander, which is the name of the petitioner in the instant case; and for the purpose of substantiating his identity, he exhibited to the Special Agent and the police officers several documents and identification cards which he had in his possession. Thereupon the Agent and officers, for the purpose of further verifying the identification, demanded that the man show them the automobile in which he had driven to the bank. Upon being shown this car, they determined that it was registered in the name of Angeles Apparel Company, which was one of the corporations included in the Alexander family business. The man so intercepted actually was the person who now is the petitioner in the instant case. Subsequent to the time of the above-described interception, representatives of the Internal Revenue Service met several times with the petitioner and his attorneys. At these times, requests were made for petitioner to disclose the *270 source of the funds with which he had purchased the above-mentioned Government securities and cashier's checks; and requests also were made for the privilege of examining the books and records of the several Alexander family businesses. The petitioner at all such times, acting upon the advice of his attorneys, refused to give any information regarding the source of the funds which he had used in purchasing the Government securities and cashier's checks; and as regards the requests for permission to examine the records of the family business organizations, such requests were denied both by petitioner and by other members of his family. Access to several of the books was subsequently obtained only after an order for their production had been procured from a United States District Court. Following the above refusals of petitioner to supply any information, the Government representatives made extensive investigations with a view to determining whether there was any nontaxable source from which the funds could have come. These investigations were not limited to the Los Angeles area - but extended also to Philadelphia and Allentown, Pennsylvania, where petitioner and members of his family *271 had previously resided. Among the records examined were: Gift, estate and income tax files, Probate Court files, police and sheriff files; fictitious name files of local governments; safe deposit box records; accounts and credit files of banks; property indexes; and all other probable sources for such information. None of these investigations revealed any nontaxable source from which petitioner could have derived the amounts in question. It is undisputed, and has now been stipulated, that petitioner is the individual who purchased all the above-mentioned Government securities and cashier's checks. In the case of each such purchase, he went to the bank unaccompanied by anyone. The particular bank or bank branch selected by him was not one where he was personally known, or where he usually transacted business and procured loans on behalf of his family business organizations; but to the contrary, it was one at which his true identity was unknown. He personally signed the applications for all purchases either in the name of "H. Miller" or in one of the variations of the name "Louis Gross;" and in each case the address which he used on the application was arbitrarily selected by him without *272 reference to the true address of either himself or of any individual known to him. Also a few days after he had made each application for purchase of securities, he would return to the bank unaccompanied by any person and would there personally receive delivery of the securities which he had purchased in the manner above described. The records of the district directors of internal revenue at Philadelphia and Los Angeles indicate that petitioner did not file an income tax return for any year prior to 1946; that for the year 1946, he filed a nontaxable return; and that as regards the years 1947 through 1955, the amounts of his adjusted gross income and income tax paid, as reported on his income tax returns, were as follows: Calendar
Adjusted
Income
Year
Gross Income
Tax Paid
1947
$ 1,170.44
$ 9.00
1948
2,628.92
193.57
1949
3,755.71
483.03
1950
9,529.00
1,761.08
1951
14,090.18
3,767.78
1952
14,276.93
4,201.93
1953
23,037.91
9,088.50
1954
18,725.90
5,870.95
1955
18,099.53
5,500.77
Totals
$105,314.52
$30,876.61
Total adjusted gross income less total income
tax paid = $74,437.91.
The Commissioner, in his notice of deficiency *273 herein, determined that the cash amounts which petitioner expended during each taxable year in purchasing bank checks and Government bearer securities, represented unreported income of petitioner for the year in which the same was so used and expended; that for the year 1955, petitioner also is chargeable with unreported income of $2,089.61, representing the interest payable on the Government securities outstanding during said year; and also that for each of the taxable years involved, additions to tax should be imposed for fraud and for underestimate of estimated income tax. Said notice of deficiency was issued by the Commissioner to the petitioner on April 2, 1959. This date was more than 3 years after the date on which petitioner's income tax return for the year 1953 was filed; was within the period for assessment and collection of any income tax or addition to tax due from the petitioner for the year 1954, as extended by a timely consent agreement of the parties (Form 872); and was less than 3 years after the date on which petitioner's income tax return for the year 1955 was filed. On September 22, 1960, after trial without a jury in the United States District Court for the *274 Southern District of California, Sidney A. Alexander (the petitioner in the instant case) was found not guilty of willfully attempting to evade and defeat "a large part of the Federal income tax due and owing by him to the United States for the calendar years of 1953, 1954, and 1955." (Stipulation of Facts, Par. 44.) The five United States Treasury bearer bonds of $10,000 face value each which petitioner purchased on February 15, 1955, matured on November 15, 1961. The 20 bonds of $10,000 face value each which petitioner received in the denominational exchanges entered into on November 10 and 11, 1955, likewise matured on November 15, 1961. And the United States Treasury bill of $5,000 face value which petitioner purchased on May 12, 1954, matured on July 29, 1954. Up to the time of trial of the instant case, which was long after said maturity dates, none of the abovementioned securities had been presented to the United States Treasury for payment, notwithstanding that each of thes securities ceased to bear interest upon its maturity. Opinion Re Issue 1 The Commissioner determined in his notice of deficiency herein, as we have hereinabove found, that petitioner is liable for *275 a deficiency in income tax for each of the taxable years involved - on the ground that petitioner is chargeable with unreported taxable income for each of these years in an amount equal to the large cash sums which he expended in purchasing bank cashier's checks and Government bearer bonds, under names and addresses other than his own, and through banks other than those where his true name and identity would be known. These determinations of the Commissioner were made only: (1) After an investigation by the Internal Revenue Service had disclosed that it was the petitioner acting alone, who had ordered, paid cash for, and received delivery of all said bank checks and Government securities, over the pertinent 3-year period; (2) after the Service had determined that the large cash sums so expended by petitioner (totaling more than $254,400 for the 3 taxable years) could not possibly have had their source in the limited amounts of gross income which he had reported for income tax purposes; (3) after petitioner had rejected repeated requests of the Service's investigating agents that he disclose the source from which he had obtained said cash; and (4) after further extensive investigations *276 by the Internal Revenue Service had failed to reveal any nontaxable source from which such amounts of cash could possibly have been acquired. Under well established principles of law, determinations of income tax deficiencies made by the Commissioner in a statutory notice of deficiency, such as the determinations of the deficiencies here involved, are prima facie correct; and the burden of proving error therein is on the taxpayer. At the trial of the instant case, the petitioner (notwithstanding his previous refusals to give any information or leads to the investigating revenue agents regarding the source of the large amounts of cash that he had used during the 3 taxable years) attempted to establish through his own testimony: That he at no time had any beneficial interest in any of the cash, cashier's checks or Government securities here in question; and that all his dealings with the same represented merely favors to an individual whom he could neither locate nor adequately identify. Petitioner's story regarding his dealings with this alleged person was, in substance, as follows: (1) That in about June 1951, there had come to petitioner's office a man whom petitioner had never *277 before seen or known. That this man stated that his name was "Louis Gross"; and that then, without further identifying himself or disclosing his address or the nature of his business, he had indicated that he possessed money from which he would like to make loans to the Alexander family business, at a rate of 12 percent per annum (being more than the 5 or 6 percent which the firm was then paying to its bank), and for periods that would be longer than those which the firm probably could otherwise arrange. That petitioner thereupon, without further investigation, accepted the man's offer for a loan to the Alexander family business in the amount of $10,000; and that a few days later, the man returned to petitioner's office and delivered the $10,000, all in $50 and $20 bills, without use of any promissory note, memorandum, check or other instrument to evidence the transaction. (2) That following completion of the above loan, the man turned over to petitioner additional currency in the amount of about $1,000; and thereupon requested petitioner to take the same to a bank and purchase on the man's behalf, a Government bearer security. And that petitioner complied with such request. (3) *278 That commencing more than a year later, in January 1953, this same person began to make frequent visits to petitioner's office, and to request that petitioner purchase numerous additional Government bearer securities on the man's behalf, with sums of cash or currency which the latter supplied. And that it was under such circumstances and arrangements that petitioner purchased, on numerous occasions during the years 1953, 1954 and 1955, all of the securities which have been listed and described in our Findings of Fact. After having seen and heard the petitioner testify at the trial of the instant case, and after having considered and weighed his testimony in relation to all the other pertinent evidence of record, we are impelled to conclude, find and here hold: That petitioner's testimony regarding his alleged dealings with the stranger, and also his testimony to the effect that he had no beneficial interest in any of the cash and securities here involved - is unconvincing, untrue and unworthy of belief. It is our view that the petitioner, who during the years involved, was administering a large manufacturing enterprise, with responsibility for handling the finances thereof, would *279 not have dealt with a total stranger, either in arranging a loan for his family's business or in purchasing more than a quarter-million dollar's worth of bearer securities - without at least verifying the name which the stranger used, without determining either the man's address or the nature and responsibility of his business, and without taking any step whatever to make some written record of the numerous transactions handled. Moreover, we think that petitioner's abovementioned testimony lacks support in the record. The books and records of the Alexander family business, and also the testimony of that firm's accountant, failed to confirm that any loan of $10,000 or other amount had been obtained from a creditor named "Gross." Also, there is no evidence of any promissory note or other instrument which either evidences such a loan, or tends to establish any of the terms thereof. And up to the time of the trial of this case (which was more than 14 years after the loan was claimed to have been made), no payment of either principal or interest on any such a loan was ever made. Furthermore, there is no evidence in the record aside from petitioner's own selfserving testimony, that any *280 portion of the purchase price of any of the securities involved was paid by or on behalf of any person other than petitioner; or that any security so purchased was ever turned over by petitioner to any other person. Based on all the foregoing, we here find and hold that petitioner has failed to establish any error in any of the Commissioner's determinations of deficiencies in income tax for the taxable years here involved. Re Issue 2 The second issue is whether any part of any of the above-mentioned deficiencies in petitioner's income tax is due to fraud, within the meaning of section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code. Each of these Codes provides in substance, that in any proceeding involving an issue as to whether or not the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner. Section 1112, 1939 Code; and section 7454(a), 1954 Code. In our opinion the Commissioner has here failed to bear such burden. True it is that there is ample evidence to establish that, during each of the taxable years involved, petitioner possessed and used large amounts of cash in the *281 purchase of bank cashier's checks and Government bearer securities, which we are satisfied could not have had its source in the amounts of gross income that petitioner reported for income tax purposes. And it is also true, that we have hereinabove rejected - as being unconvincing, untrue and unworthy of belief - all of petitioner's testimony to the effect that such cash (totaling more than $254,400) belonged solely to a mysterious stranger whom he could not locate, and also could not identify other than by an alleged name. But this still leaves the Commissioner in substantially the same position as if the petitioner had not attempted to offer any explanation for his possession of said cash sums. See, Denny York, 24 T.C. 742, 744. There still is no proof as to the source of such cash; or as to the manner or means through which petitioner acquired the same; or as to the nature of the particular fraudulent act or acts relied upon. The Commissioner's determination that additions to tax for fraud should be imposed is not evidence in itself; and such determination does not aid him in bearing his above-mentioned burden of proof. Also, conjecture can not serve in lieu of clear *282 and convincing evidence. We therefore decide this second issue in favor of the petitioner. Re Issue 3 The Commissioner's counsel conceded during the trial herein, that assessment and collection of the liabilities determined against petitioner for the taxable year 1953 would be barred by the statute of limitations, unless the Commissioner succeeded in proving fraud as to that year. We have held under Issue 2, that the Commissioner has failed to bear the burden of proving fraud as to any year here involved; and therefore, in accordance with the Commissioner's above-mentioned concession, we hold that assessment and collection of any deficiency or addition to tax for the taxable year 1953 is barred by limitation. For reasons stated in our Findings of Fact, assessments and collections as to the other 2 years involved are not barred by the statute of limitations. Re Issue 4 This final issue is whether, for the years 1953 and 1954, additions to tax for substantial underestimate of estimated income tax should be imposed under section 294(d)(2) of the 1939 Code. As regards the year 1953, we have held that assessment and collection of any addition to tax is barred by the statute *283 of limitations; and therefore, as to said year, we decide that no addition to tax under section 294(d)(2) should be imposed. As regards the year 1954, the petitioner had the burden of proof in respect to this issue. We hold that he has failed to meet such burden, for the same reasons that he failed to meet his burden of proof under Issue 1. We therefore approve the Commissioner's determination as to this issue for the year 1954. Decision will be entered under Rule 50. Footnotes
*. Re purchase of 2/14/55: Of the $100,791.61 cost, $80,000 was derived from the several above shown redemptions of bearer securities made on the same date. Balance was paid in cash. ↩
**. Re purchases of 2/15/55: Of the $151,150.90 cost, $143,089.61 was derived from the several above shown redemptions of bearer securities made on the same date. Balance was paid in cash. ↩
***. Re transactions of 11/10/55 and 11/11/55: These were denominational exchanges, involving no cash, in which each of the previously purchased $100,000 bearer bonds was exchanged for 10 bearer bonds of $10,000 each.↩